FRANCISCO AGOSTINI ET AL., Petitioners, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, J. M. ALMODÓVAR ACEVEDO, JUDGE, Respondent; THE PUERTO RICO LIGHTERAGE Co.. Intervener.

No. 2573. Submitted April 22, 1960.—Decided March 7, 1961.

214

*Vicente Géigel Polanco* and *Vicente Géigel Lanuza* for petitioners. *Hartzell, Fernández & Novas* and *Vicente M. Ydrach* for intervener, defendant in the main action.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

On December 4, 1958, Francisco Agostini and 51 other plaintiffs filed a complaint in the Superior Court, San Juan Part, against the defendants Puerto Rico Coal Company and The Puerto Rico Lighterage Company, in a claim for wages for services rendered during the years 1949 to 1958 included.

The defendants filed their answer to the complaint by way of a general denial of the facts alleged therein and they raised among other affirmative defenses that any claim for wages prior to September 3, 1954 was barred as to all the plaintiffs.[1]

Thereafter, the parties filed in the lower court the following stipulation of facts:

"Stipulation.—The parties to this lawsuit appear through their undersigned attorneys and respectfully submit to this Honorable Court the following stipulation of facts:

---

[1] The grounds for this defense of prescription are set forth by the defendants in the following way:

"II

"On June 24, 1954 all the employees of the defendants went on strike and from that date on they ceased to be defendants' employees.

"III

"From July 25 until September 6, 1954, all the employees of the defendants became employees of the Emergency Administration of Piers, an organization created by Act No. 1, approved by the Legislative Assembly of Puerto Rico on July 25, 1954.

"IV

"On September 3, 1954 the defendants signed an agreement with the plaintiffs by virtue of which a new labor-management relationship was established.

"V

"The agreement signed on September 3, 1954 with the Unión de Empleados de Muelles de Puerto Rico, constitutes a new employment contract pursuant to § 1867 of the Civil Code of Puerto Rico and to the decision in *Chabrán* v. *Bull Insular Lines, Inc.*, 69 P.R.R. 250, and therefore, any claim for wages prior to September 3, 1954 is barred as to all the plaintiffs."

"1.—The plaintiffs, except Francisco Agostini and Miguel Ángel Picart, have been working for one or the other of the defendants since on/or before 1949, under the terms and conditions stated in several collective bargaining agreements.

"2.—On May 9, 1952 the defendants signed a collective bargaining agreement with the Unión de Empleados de Muelles de Puerto Rico, which was made retroactive to January 1, 1952, and it was agreed that it would be in force until December 31, 1953, and the plaintiffs, except the two persons mentioned above, worked for one or the other of the defendants according to the terms of said agreement.

"3.—On June 24, 1954 a strike was called on the waterfront in San Juan, P. R., the plaintiffs participating therein.

"4.—As a result of said strike, on July 25, 1954, the Legislative Assembly of the Commonwealth of Puerto Rico approved a law whereby it seized the port facilities, and the Court is requested to take judicial notice thereof.

"5.—On July 28, 1954 the Honorable Governor of Puerto Rico, pursuant to the authority conferred upon him by said Act, seized said port facilities.

"6.—Pursuant to the terms of said Act, the Governor of Puerto Rico designated Mr. Salvador V. Caro as Emergency Administrator of the Piers of Puerto Rico. The latter, in turn, designated several persons as his representatives in the different piers, including a representative whom he designated to take charge of the operations of the Porto Rico Lighterage Co. and the Porto Rico Coal Co.

"7.—During the period of seizure by the Emergency Administration of the Piers, the latter continued to use the same personnel employed by the defendants, including the plaintiffs; the Emergency Administration of Piers paid all the operating costs from a special fund created by the afore-mentioned Act, and once those payments were made, the Administration of Piers invoiced the defendants for the expenses incurred in relation to such operation; the defendants, in turn, paid the amount of the respective bills to the Administration. The administration paid the wages of defendants' employees, including plaintiffs' wages and later the defendants reimbursed said payments to the Administration.

"8.—On September 3, 1954 an agreement was reached between the Unión de Empleados de Muelles de Puerto Rico, Local No. 24927 of the American Federation of Labor and several companies, two of which were the defendants herein, who were represented by the Puerto Rican Steamship Association, stipulating the conditions of work and salaries of the plantiffs, except Francisco Agostini and Miguel Angel Picart; said agreement was given a retroactive effect to January 1, 1954, and was to remain in force until September 30, 1956, except the clauses relating to wages."

On September 23, 1960, the Superior Court issued the following:

"Order.—The stipulation of facts of September 11, 1959, the complaint and the answer thereto having been considered, the special defense of prescription alleged by the defendant is hereby sustained on the same grounds set forth in the order issued by us in the case of Félix Hernández et al., plaintiffs, v. Puerto Rico Steamship Association et al., civil number 57-2580, and therefore, the court decides that any claim for wages for the period prior to June 24, 1954, is barred, that being the date on which all defendants' employees went on strike and ceased to be the defendants' employees."

To review said order we issued a writ of certiorari.

The petitioners charge the lower court with the commission of three errors, to wit: (1) having declared that any claim prior to June 24, 1954 was barred on the ground that on that date the plaintiffs went on strike and from that date ceased to be defendants' employees; (2) having rested their opinion on the decision of this Court in *Chabrán* v. *Bull Insular Lines*, 69 P.R.R. 250; and (3) not having applied to decide this case the provisions of §§ 32 and 34 of the new Minimum Wage Act approved June 26, 1956.

■ The first two errors take us to an examination of our case law, as it stood before the Minimum Wage Act of 1956 went into effect, regarding the limitation or prescription of actions brought for the fulfilment of the obligations to pay the workers for their services.

The limitation or prescription of these actions was governed by § 1867 of the Civil Code (1930 ed.)—31 L.P.R.A. § 5297—which provides that:

"Section 1867. Actions for the fulfilment of the following obligations shall prescribe in three years:

"1. . . . . . . . .

"2. . . . . . . . .

"3. For the payment of mechanics, servants, and laborers the amounts due for their services, and for the supplies or disbursements they may have incurred with regard to the same.

"4. . . . . . . . .

"The time for the prescription of actions referred to in the three preceding paragraphs shall be counted from the time the respective services have ceased to be rendered."

How have we determined the commencement of the prescriptive term of three years in the actions mentioned in paragraph 3 copied above? Interpreting the phrase "from the time the respective services have ceased to be rendered," our decisions have contemplated the following situations as determinative of the commencement of said term: (1) when there is a substantial change in the nature of the services rendered by the worker; (2) when a worker leaves his employment without offering an explanation therefor, even though his employer rehires him; and (3) when a worker goes on strike, wins it and signs a new contract with the same employer, this new contract containing substantial changes in the conditions of employment.

In *Muñoz* v. *District Court*, 63 P.R.R. 226, the worker rendered the same services to his employer uninterruptedly from June 20, 1936 to November 18, 1940, date on which he ceased to render said services. He filed a complaint for the recovery of unpaid wages on December 10, 1942. This Court rejected the employer's contention that the action for the recovery of unpaid wages for the services rendered by the worker before December 10, 1939, had prescribed. We stated that the phrase "from the time the respective services

have ceased to be rendered" can not mean anything else but that the prescriptive term in this case began to run from November 18, 1940, the date on which the worker ceased to render his services to his employer. On reconsideration we stated that § 1867 of our Civil Code should be construed in accordance with its own terms, considered in the light of its legislative history. Said section is equivalent to § 1967 of the Spanish Civil Code, which has its origin in Law 10, Tit. II, Book 10 of the *Novísima Recopilación*, which provides that an action for the recovery of wages due to servants or menial servants for services rendered should be instituted "within three years after they were discharged by said masters," unless it were proved that prescription had been interrupted by demands of payments during said period. The reason adduced for this provision was the great disadvantage of the worker with respect to his employer during the sixteenth century; that the worker would never dare to sue his master without running the risk of losing his job and therefore a period of three years from the date on which the worker became free of his employer's influence was established. We added then that when the Spanish Civil Code went into effect in the nineteenth century, its authors realized that a change in the nature of the services rendered by the worker constituted a novation which abolished the former contract and gave rise to a new contract. With this in mind they were undoubtedly prompted to limit the scope of the law of the *Novísima Recopilación*, so that the time for prescription would be computed from the day each contract expired without taking into account whether the worker remained in the same employment and to achieve this end they prescribed in the last paragraph of § 1967 of the Civil Code that the term for the prescription of these actions shall be computed from the time the *respective services* were last rendered.

In *Avellanet* v. *P. R. Express Co.*, 64 P. R. R. 660, we held that the record of the case showed, not that the services performed by claimant were of a different nature, but rather that he continued to do exactly the same work as he had always done, and that, therefore, his claim was not barred under § 1867 of the Civil Code, and that in order to compute the three-years period of prescription provided by said section, from the time the respective services ceased to be rendered, there must at least be a true change in the type of work performed by the employee. The employer's contention was that from 1927 until October 24, 1938, the worker was employed in connection with the receipt and dispatch of local freight and that thereafter, he worked on other freight, presumably moving in interstate commerce. The court considered that the worker continued to do exactly the same work as he had always done. Hence, a novation did not take place in 1938.

In *Jiménez* v. *District Court*, 65 P.R.R. 35, we held that an employee in a year-round industry who leaves his employment for months or years without offering any explanation therefor, ceases at that time to render services to his employer within the meaning of § 1867 of the Civil Code, for purposes of the limitation period for any claim for his services rendered up to that date, even though later he is rehired by the same employer. We added besides, that such things as brief illness of the employee, breakdown of machinery, or temporary lack of work would not accomplish that result. A mere absence from work for a limited number of days by the worker, with proof furnished by the latter as to the cause of the absence, would not constitute the cessation of services contemplated by the statute.

In *Valiente & Cía.* v. *District Court*, 68 P.R.R. 491, we confirmed the doctrine of the *Jiménez* case regarding the cessation of services of the worker due to an unexplained absence from his work.

Thereafter, we decided the case of *Chabrán* v. *Bull Insular Line*, 69 P.R.R. 250. Let us examine the facts therein.

On January 3, 1938 the employees of the shipping companies went on strike. On February 10, 1938 the workers and the shipping companies signed an agreement submitting the dispute to an Arbitration Board and the employees of the companies returned to work on February 12. On May 26, 1938 the Arbitration Board signed an opinion and award which provided that the award would operate as a collective bargaining agreement, for the period of one year from January 1 to December 31, 1938, between the companies and the employees involved with the same effect as if the parties had executed such a contract on January 1, 1938. Both sides accepted the award. We held that the arbitration award, treated as a collective bargaining agreement for a year, was a wholly new arrangement between the company and its employees, which terminated all existing arrangements and gave rise to a new period of services. As the new contract went into effect on January 1, 1938, the statute of limitations began to run on that date for claims for work done prior thereto. On page 262, we stated that:

"Here the explanation for interruption of services was a strike of six weeks' duration and a new contract, containing new conditions of work and salaries for the entire industry. But that is not the type of 'explanation' contemplated by the *Jiménez* case, where illness, breakdown of machinery or temporary lack of work are given as examples of explanations which are sufficient to prevent the running of the statute. None of these illustrations involves voluntary action on the part of the employee. Here Chabrán voluntarily left the employ of the defendant because he was dissatisfied with the terms of his employment. After a month and a half, he returned to work under a new contract. It is true that in his particular case the only change was a 25 per cent increase in salary. But the new contract made a number of substantial changes in the operations and working conditions of the employees of the industry as a whole. The combination of interruption of services for a month

and a half and a new contract satisfy us that in this particular case the statute of limitations, under the language just quoted from the *Muñoz* and *Jiménez* cases, began to run from January 1, 1938, the date of the new contract, on claims for work done prior to that date."

On page 263, we added:

"Chabrán contends and the district court held that to treat the interruption of services caused by the strike as starting the running of the prescriptive period would be to impair the right to strike. We cannot agree. In the first place, we note that under the facts of this case the new contract, together with the interruption caused by the strike, rather than the latter alone, started the running of the statute. But what is more important is that we find no incompatibility between the right to strike and the rule we lay down here."

And on page 266, we stated that:

". . . The right to strike is in no way related with § 1867. Employees may strike. But if they do and win the strike thereby obtaining a new contract for services, there is no room for the contention that the former services have not been terminated. Section 1867 on its face applies to those facts and bars claims for work done prior to a new contract executed under these circumstances . . ."

In *Vicenty* v. *Corona Brewing Corporation*, 73 P.R.R. 131 and in *Sierra* v. *Mario Mercado e Hijos*, 81 P.R.R. 305, we ratified once more the doctrine of the novation of the contract by reason of substantial changes in the nature of the services rendered by the worker, without taking into account the fact that the latter continues at the service of the same employer.

In *Berríos* v. *Eastern Sugar Associates*, 79 P.R.R. 647, we held that when a worker ceases in his employment and thereafter he starts to work in a new job, the prescription period of three years starts to run from the time he ceased to work in the original employment.

Our case law determines, then, that the worker ceases to render the respective services (1) when he ceases to work for

his employer, (2) when he interrupts his services for a certain period of time without any explanation therefor, although the employer rehires him, and (3) when without ceasing to work for his employer, a novation of the contract takes place by reason of substantial changes in the nature of the services rendered by the worker.

■■ The petitioners-plaintiffs maintain that the prescription of their actions is governed by the new Minimum Wage Act of 1956 and that since this law established a new concept of prescription in matters regarding claims for wages, neither § 1867 of the Civil Code nor the cases interpreting it, including the *Chabrán* case, *supra*, are applicable to their case. On the contrary, the defendants maintain that (1) the doctrine of the *Chabrán* case is applicable to the petitioners' case and decides against them the issue involved therein, and (2) irrespective of the doctrine of the *Chabrán* case, petitioners' claims are barred because of the seizure of the piers by the government of the Commonwealth of Puerto Rico.

The Minimum Wage Act of 1956 (29 L.P.R.A., Cum. Supp. 1958, § 245 *et seq.*) provides in matters regarding the limitation of actions for wages, the following:

"§ 246d. Limitation of actions

"(*a*) The right to institute an action to recover wages which an employee may have against his employer under sections 245–246m of this title, under the mandatory decrees heretofore or hereafter approved pursuant to its provisions, under the orders promulgated by the Board, or under any contract, agreement or law, shall prescribe upon the lapse of three years. For the purpose of the prescription of such action the time shall be reckoned from the date the employee ceased in his employment with the employer.

"(*b*) Where the employee is working with the employer, the claim shall include only the wages to which the employee may be entitled, on any score, during the last ten years immediately preceding the date on which he may institute the judicial action.

"(c) In the event the employee has ceased in his employment with the employer, the claim shall include only the last ten years immediately preceding the date of his ceasing.

"(d) In connection with the limitation of actions provided in this section, a change in the nature of the work of the employee shall not constitute a novation of the contract of hire.

"(e) The provisions of this section shall in no wise affect the cases already filed in court or that may be filed within one (1) year after sections 256–246m of this title take effect.—June 26, 1956, No. 96 p. 622, § 32."  (29 L.P.R.A., 1958 Supp. 105.)

As the complaint in this case was filed on December 4, 1958, more than a year after the effectiveness of the Minimum Wage Act—Act No. 96 of June 26, 1956—the prescription of plaintiffs' action is governed by this new Act and not by § 1867 of the Civil Code.  The Legislature had the power to modify said period of limitation.  *Morales* v. *Federal Land Bank*, 56 P.R.R. 825.  On the other hand, when the new Minimum Wage Act went into effect, the three-year term within which the plaintiffs had to institute their action had not elapsed, even if we accept that according to the theory of the *Chabrán* case, the plaintiffs ceased to render the respective services to the defendants on September 3, 1954, on which date the new agreement took place, or on June 24 of the same year, the date on which the strike began.

The defendants admit that § 32(a) of the new Minimum Wage Act changed the judicial doctrine of prescription laid down in the cases of *Avellanet* v. *Porto Rican Express Co.*, *supra*, and *Vicenty* v. *Corona Brewing Corporation*, *supra*, and that it was thus expressly set forth in the Report from the Joint Committee (of the Legislative Assembly of Puerto Rico) on Minimum Wages which recommended the Bill (B. of the S. 803) which culminated in the Minimum Wage Act of 1956.  In effect, said report sets forth that:

"Paragraph (d) states that for the purpose of reckoning the five-year period (read 10 years) fixed in subsections (b) and (c), a change in the nature of the work done by the laborer

would not constitute a novation of the contract for hire. *The effect of this provision is significant since it alters the judicial doctrine regarding prescription now in force. (Avellanet v. Porto Rican Express Co.,* 64 P.R.R. 660 (1945); *Vicenty v. Corona Brewing Corporation,* 73 P.R.R. 131 (1952)."* (Petitioners' brief, p. 10.)

■■ The defendants maintain, however, that the above-quoted § 32 did not alter the doctrine of the *Chabrán* case. We do not agree. In the case of *Vicenty v. Corona Brewing Corporation, supra,* we stated:

"Construing the scope of subdivision 3 of § 1867 of the Civil Code, *supra,* we have held that the three-year period provided therein shall be counted from the time the respective services ceased to be rendered, one of the instances in which this is so being, as we said in *Muñoz v. District Court,* 63 P.R.R. 226, when 'there had been a change in the nature of the services rendered by the workman and a process of renovation was under way which abolished the former contract and gave rise to a new contract . . . so that the time for prescription would be computed from the day each contract expired without taking into account whether the workman remained in the same employment.' To the same effect see *Avellanet v. Porto Rican Express Co.,* 64 P.R.R. 660; *Jiménez v. District Court,* 65 P.R.R. 35; *Valiente & Cía. v. District Court,* 68 P.R.R. 491; *Chabrán v. Bull Insular Line, supra."* (73 P.R.R. 131, 139.)

Here we have cited the *Chabrán* case as one which involved the doctrine of novation because of a change in the nature of the services rendered by the worker. In effect, in the *Chabrán* case we held that as the new contract went into effect on January 1, 1938, the statute of limitations began to run on that date in claims for work done prior thereto. The theory of this decision was that the new arrangement between the defendant and its employees terminated all existing arrangements and began a new period of services. It is true that in the *Chabrán* case we used some language susceptible of being interpreted in the sense that the respective services rendered by the worker terminate when the latter

goes on strike. Thus, for example, on page 263 we stated that to treat the interruption of services caused by the strike as starting the running of the prescriptive period would not impair the right to strike, and on page 266 we added that the right to strike is in no way related with § 1867; that the employees may strike; but if they do and win the strike thereby obtaining a new contract for services, there is no room for the contention that the former services have not been terminated. We made it clear, however, on page 263, that under the facts of that case the new contract, together with the interruption caused by the strike, rather than the latter alone, started the running of the statute. As a consequence thereof, the date of the new contract and not the date on which the strike went on was fixed as the starting point of the statute of limitations. Therefore, it is untenable that the doctrine of novation of the contract, which as we have seen was altered by § 32 (d) of the Minimum Wage Act of 1956, was not involved in the *Chabrán* case. Assuming even that according to the case law it could be maintained, when interpreting § 1867 of the Civil Code, that with the beginning of strike the worker ceases to render the respective services to his employer and that the statute of limitations starts to run from that moment, such a doctrine has long ceased to have any juridical force by virtue of the provisions of the Minimum Wage Act of 1956. In effect, in § 32 (d) of said law the phrase *"from the time the respective services have ceased to be rendered"* which is the language used in § 1867 of the Civil Code was substituted by the phrase *"from the date the employee ceased in his employment with the employer."* The strike brings about an interruption in the services rendered by the worker for his employer but it does not cause the cessation of his employment. The right to strike is an effective means which our Constitution has placed in the hands of the workers and their unions to procure better conditions of employment and to attain a higher standard of

living when the employer refuses to agree to their demands. If we interpret the law in the sense that the employee who goes on strike ceases in his employment with his employer, it seems to us that in some way we are limiting, curtailing, or impairing the right to strike. At least one of the effects of such an interpretation would be to designate the beginning of the strike as the moment from which the statute of limitations starts to run in actions for the recovery of unpaid wages. This means that the right to strike would cease to be a right if it is to be interpreted as having no other scope but the cessation of the worker's employment with his employer. It must not be forgotten that hand in hand with the right to strike there is the workman's right to post pickets and the principle of collective bargaining. For the purpose of protecting these rights, the Legislature provided in § 34 of the Minimum Wage Act the following:

"§ 246f. Right to strike and to collective bargaining

"Nothing herein contained shall authorize government officers or courts of justice to construe §§ 245–246m of this title in the sense of limiting, restraining, curtailing or in any manner impairing the right to strike and of picketing which laborers have for procuring their economic betterment, or the principle of collective bargaining.—June 26, 1956, No. 96, p. 622, § 34." (29 L.P.R.A., Cum. Supp. 1958. p. 106.)

We conclude, therefore, that pursuant to the provisions of the Minimum Wage Act of 1956, neither the interruption of the services rendered by the worker caused by a strike, nor the signing of a new contract, nor the combination of both, starts the running of the statute of limitations.

■ What has been said would be sufficient to dispose of the case, were it not for the fact that the defendants rely upon the additional fact that during the period between the beginning of the strike and the signing of the new contract with them, the petitioners worked for another employer, the Commonwealth of Puerto Rico. They maintain that when

the Government seized the port facilities by virtue of the provisions of Act No. 1 of July 25, 1954, the relation of master and servant was established in fact and in law between the Emergency Administration of Piers and the workers, and that as a consequence thereof, the latter *ceased in their employment* with the defendants.

We do not agree with the defendants-appellees. The seizure and operation of the port facilities by the Emergency Administration of Piers until the workers on strike and the companies would sign a new agreement on September 3, 1954, did not cause the cessation of the worker's employment with said defendants, on account of the fact, as the latter allege, that they worked for another employer, that is, the Government of the Commonwealth of Puerto Rico. The debate which took place in our Legislature, while the bill which became Act No. 1 of July 25, 1954 was discussed, is of little help to determine whether the government became the strikers' employer and that as a consequence thereof, the strikers ceased to be the defendants' employees. Although it is true that some legislators expressed their opinion that the government became the employer during the period they seized and operated the port facilities, it is not less true, however, that other legislators expressed a contrary view.[2] The context of the law itself, its purpose and the way it was applied, convince us that the workers on strike did not cease in their employment with the defendants when the Emergency Administration of the Piers seized and operated the port facilities. This seizure and operation was a simple intervention by the government for reasons of public policy. Its duration lasted until the defendants and the other companies, after they continued bargaining, reached an agreement and they signed a new contract with their employees who went on strike. It should be borne in mind that the wages paid by

---

[2] See Journal of Proceedings of the Legislature Assembly (1954), Vol. V, pp. 18 *et seq.*

the Emergency Administration of Piers to the workers, including the plaintiffs, were billed to the defendants and thereafter the latter refunded the amount of said payments to the Administration. Furthermore, there is a fact of undisputable relevance and of great weight in the decision of this issue. The contract signed on September 3, 1954, providing for the working conditions and salaries of the plaintiffs, except Francisco Agostini and Miguel Angel Picart, was given a retroactive effect to January 1, 1954 and was to remain in force until September 30, 1956, except the clauses regarding salaries. So that the new contract covered the period from January 1, 1954 to 1956 and therefore, it covered the emergency period during which the government operated the port facilities. We do not see how it can be validly maintained that the plaintiffs ceased in their employments with the defendants for having worked during the emergency decreed by the legislature.

For the reasons set forth the order rendered on September 23, 1959 by the Superior Court, San Juan Part, is hereby set aside and the case is remanded for further proceedings not inconsistent with this opinion.